1

2

3

4

5

6

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

7

8

9

10

11

12

WILD FISH CONSERVANCY, et al.,

          Plaintiffs,

v.

NATIONAL PARK SERVICE, et al.,

          Defendants.

CASE NO. C12-5109 BHS

ORDER

13

14

15

16

17

18

19

20

21

22

     This matter comes before the Court on Plaintiffs Federation of Fly Fishers

Steelhead Committee, Wild Fish Conservancy, Wild Salmon Rivers, and Wild Steelhead

Coalition's ("Plaintiffs') motion for summary judgment (Dkt. 153) and Defendants

Daniel M. Ashe, John E. Bryson, Jonathan B. Jarvis, NOAA Fisheries Service

("NMFS"), National Park Service ("NPS"), Samuel D. Rauch, III, Kenneth L. Salazar,

United States Department of Commerce ("DOC"), United States Department of the

Interior ("DOI"), and United States Fish and Wildlife Service's ("FWS") (collectively

"Federal Defendants") cross motion for summary judgment (Dkt. 164).  The Court has

considered the pleadings filed in support of and in opposition to the motions and the

1  remainder of the file and hereby grants in part and denies in part the parties cross-motions

2  for summary judgment the motion for the reasons stated herein.

3  ### I. PROCEDURAL HISTORY

4      On February 9, 2012, Plaintiffs filed a complaint for declaratory and injunctive

5  relief against numerous Defendants alleging numerous violations regarding the

6  implementation of fish hatcheries in the Elwha River.  Dkt. 1.

7      On November 11, 2012, Plaintiffs filed a first supplemental complaint.  Dkt. 66.

8  On February 11, 2013, Plaintiffs filed a second supplemental complaint.  Dkt. 125.

9      On February 12, 2013, the Court granted the motion to dismiss of Defendants

10  Doug Morrill, in his official capacity as the Fisheries Manager for the Lower Elwha

11  Klallam Tribe, Larry Ward, in his official capacity as the Hatchery Manager and

12  Fisheries Biologist for the Lower Elwha Klallam Tribe, Robert Elofson, in his official

13  capacity as the Director of the River Restoration Project for the Lower Elwha Klallam

14  Tribe, and Mike McHenry, in his official capacity as the Fisheries Habitat Biologist and

15  Manager for the Lower Elwha Klallam Tribe.  Dkt. 126.

16      On March 26, 2013, Plaintiffs filed a third supplemental complaint.  Dkt. 131.

17      On June 26, 2013, Plaintiffs filed a motion for summary judgment.  Dkt. 153.  On

18  July 24, 2013, the Federal Defendants responded and filed a cross-motion for summary

19  judgment.  Dkt. 164.  On August 7, 2013, Plaintiffs responded to the Federal Defendants'

20  motion.  Dkt. 170.  On August 21, 2013, the Federal Defendants replied.  Dkt. 171.  On

21  August 27, 2013, Plaintiffs filed a surreply requesting that the Court strike material that

22  the Federal Defendants submitted in support of their reply.  Dkt. 175.

1    On March 12, 2014, the Court held a hearing on the cross-motions and, during the

2    hearing, requested additional briefing on two issues.  *See* Dkt. 185.  On March 17, 2014,

3    the Federal Defendants filed a supplemental brief.  Dkt. 188.  On March 21, 2014,

4    Plaintiffs filed a supplemental brief.  Dkt. 189.

5                               **II. FACTUAL BACKGROUND**

6    The Elwha River is approximately forty-five miles in length, flowing north on the

7    Olympic Peninsula in Washington State into the Strait of Juan de Fuca near Port Angeles.

8    NMFS007171; 1104-FWS.[1] The river's watershed encompasses approximately 321

9    square miles, of which approximately 267 square miles are within the Olympic National

10   Park. NMFS007171; 1104-FWS; and *see* NMFS015983.

11   The Elwha River was once one of the most productive anadromous fish streams in

12   the Pacific Northwest, believed to have produced nearly 400,000 spawning fish annually.

13   *See* NMFS015982, 033301–02; 774, 866-FWS.  In the early 1900's, the Elwha and

14   Glines Canyon Dams were constructed without fish passage structures, and they blocked

15   upstream fish passage to more than 70 miles of mainstem and tributary habitat.

16   NMFS007171; 798, 866, 932-FWS.  Salmonids returning to spawn have been confined to

17   the lower 4.9 miles of the river below the Elwha Dam and have not had access to the vast

18   majority of the river's spawning habitat.  NMFS007171; 780, 798, 932-FWS.  The result

19   was a "precipitous decline of salmonid populations to fewer than 3,000 naturally

20

21   _____

22       [1] Citations are to the particular department's administrative record.  *See* Dkts. 52, 76, & 135.

1  spawning fish compared to an estimated 392,000 fish prior to dam construction."  774,

2  798-FWS.

3      In 1992 Congress passed the Elwha River Ecosystem and Fisheries Restoration

4  Act ("Elwha Act"), Pub. L. 102-495, 106 Stat. 3173 (Oct. 24, 1992), which instructed the

5  Secretary of the Interior to acquire the Elwha and Glines Canyon Dams and submit to

6  Congress a report for "full restoration of the Elwha River ecosystem and the native

7  anadromous fisheries."  Elwha Act § 3(c). The DOI submitted the Elwha Report to

8  Congress in 1994.  NPS2625.  In 1995, NPS completed the Elwha River Ecosystem

9  Restoration Environmental Impact Statement, which evaluated five alternatives for

10  restoring the Elwha River by wholly or partially removing the dams, or modifying them

11  to incorporate fish passage capabilities.  NPS2374–2623 ("Programmatic EIS").  NPS

12  ultimately chose removal of both dams as the only alternative that would meet the stated

13  goal of the Elwha Act.  This alternative was referred to as the "Proposed Action" and was

14  described as follows:

15      [DOI] proposes to fully restore the Elwha River ecosystem and
       native anadromous fisheries through the decommissioning of Elwha Dam
16      and Glines Canyon Dam and removal of all structures necessary, including
       all or part of both dams, powerhouses, reservoirs, and associated facilities
17      to achieve this purpose.

18  NPS2374.

19      In 1996, NPS completed the Implementation EIS, which analyzed alternatives for,

20  and environmental impacts of, removing both hydroelectric dams and implementing

21  fisheries restoration measures.  NPS1841–2372 ("Implementation EIS"); NPS1822 (1996

22  Record of Decision).  The analysis examined the level of expected sedimentation

1    resulting from the dam removal and the effect it would have on fish.  NPS2067–68.  NPS

2    found that there were three suspended sediment concentration thresholds for fish: 200

3    parts per million ("ppm") (causing physiological stress, reduced growth); 1,000 ppm

4    (lethal from chronic exposure); 10,000 ppm (lethal from acute exposure).  NPS2067.

5    NPS's modeling predicted that there would be four distinct phases in which there would

6    be "direct losses" of fish, with sedimentation ranges rising as high as 51,000 ppm.

7    NPS068 (table 46).  NPS considered hatchery support and outplanting to "ensure

8    protection of fish stocks during periods of high sediment yields."  NPS2068–2070.  The

9    discussion and related table referred to outplanting in the middle and upper Elwha River.

10   *Id*.

11        In July 2005, DOI issued a supplemental EIS ("SEIS") because "several changes"

12   had occurred.  ELWHA004440.  Although the SEIS was "designed as a stand-alone

13   document for readability," DOI asserted that it was "legally an extension of the

14   [Implementation EIS]."  ELWHA004441.  The supplement states that "changes and new

15   information have resulted in the need for different mitigation than that analyzed in the

16   [Implementation EIS]."  ELWHA004440.  DOI proposed mitigation measures to

17   accomplish four goals, two of which relate to the instant matter and are as follows: (1) "to

18   protect municipal and industrial water users and two fish propagation facilities

19   (hatcheries) during dam removal," and (2) "to protect listed fish to the maximum extent

20   possible during and following dam removal."  *Id*.  Some of the preferred means to

21   accomplish these goals were stated as follows:

22

1   providing access to clean tributary habitat for bull trout; keeping the
    Washington State Department of Fish and Wildlife [("WDFW")] chinook-
2   rearing channel open during dam removal; moving the tribal fish hatchery;
    and creating rearing ponds on nearby Morse Creek to ensure the survival of
3   Elwha chinook during dam removal.

4   *Id.*

5   The SEIS includes a section describing the actions evaluated and rationale behind

6   these actions.  For the fish restoration portion of the supplement, the document provides

7   as follows:

8   Since the release of the [Implementation EIS], both Elwha River
    chinook salmon and bull trout have been listed as federal threatened
9   species. The [FWS] (for bull trout) and [NMFS] (for chinook salmon) will
    require additions to the fish restoration plan intended to preserve and
10  protect populations of both species. For example, the WDFW rearing
    channel was to have been closed during dam removal, but it is now going to
11  remain open as a measure to more fully protect the native chinook salmon
    population during the dam removal process. A bull trout rescue and
12  removal plan is required, and culverts blocking access to tributaries within
    Olympic National Park that could be used by bull trout as a refuge during
13  dam removal must be replaced or modified. Efforts to remove eastern brook
    trout from these tributaries prior to culvert removal would be undertaken to
14  prevent hybridization with bull trout. To help mitigate impacts to chinook
    salmon, dam removal activities would stop during two additional periods
15  each year to facilitate seaward migration of smolts in the spring and
    upstream migration of adults in the summer and fall.

16  ELWHA004450.

17  The SEIS recognizes that the proposed actions will affect "species of special

18  concern."  ELWHA004455.  The summary of the plan with regard to these species was as

19  follows:

20  Measures taken to preserve the native chinook salmon population
    during dam removal, including maintaining an artificially propagated
21  chinook population at the WDFW fish-rearing facility, ensuring that the
    WDFW facility is provided with clean water, and creating a reserve
22

chinook population using Elwha stock in an adjacent watershed (Morse Creek), would offer beneficial outcomes by increasing the likelihood that chinook salmon would be preserved and restored in the Elwha River following dam removal.

        Measures to protect bull trout fall into four categories: (1) a plan for rescuing and removing individual bull trout; (2) transporting rescued bull trout to clean water areas; (3) improving accessibility to Elwha River tributaries during and following dam removal; and (4) monitoring effects of dam removal on bull trout habitat from the mouth of the river to the upstream end of Lake Mills.

ELWHA004455–004456.

On October 16, 2012, NMFS published notice in the Federal Register that it was formally evaluating these Hatchery and Genetic Management Plans ("HGMPs") and that a draft Environmental Assessment ("EA") was available for public comment. 77 Fed. Reg. 63294 (Oct. 16, 2012). The draft EA incorporated by reference the prior NPS EISs, and analyzed four alternatives in detail. NMFS 9716; 9723-25. Under Alternative 1, the "no action" alternative, NMFS would take no action to either approve or reject the HGMPs, and assumed the State and Tribe would operate the hatcheries under baseline conditions. Under Alternative 2, the proposed action, NMFS would determine that the HGMPs met the criteria of the ESA 4(d) Rule, and the hatchery programs would be implemented as submitted. Alternative 3 analyzed the possibility of NMFS approving revised HGMPs with a "sunset term," stopping hatchery releases around 2019. Alternative 4 considered the effects of a decision by NMFS that the submitted HGMPs did not meet the requirements of the 4(d) Rule, and hatchery programs would be terminated immediately. Plaintiffs submitted comments to the HGMP's and the draft EA. NMFS10847–11208.

1    NMFS issued a recommended determination to approve the Elwha River HGMPs

2    under the ESA 4(d) Rule on December 10, 2012.  NMFS16131–16204.  NMFS also

3    issued a final EA under NEPA that included a FONSI ("Limit 6 EA")[2] and a BiOp under

4    section 7 of the ESA ("December 10, 2012 BiOp").  NMFS15375–15509; NMFS015898–

5    16130.  The "agency actions" proposed in the recommended determination, and

6    evaluated under NEPA and the ESA, included NMFS' approval of the HGMPs under the

7    ESA 4(d) Rule and DOI's funding of the hatcheries.  *See* NMFS16132, NMFS15911–

8    15912.  NMFS approved the Elwha River HGMPs under the 4(d) Rule on December 10,

9    2012.  NMFS016205-16213

10                          **III. DISCUSSION**

11   **A.    Motions to Strike**

12       "[R]eview is limited to 'the administrative record already in existence, not some

13   new record made initially in the reviewing court.'"  *San Luis & Delta-Mendota Water*

14   *Authority v. Jewell*, ___ F.3d ___, 2014 WL 975130 (9th Cir. 2014) (quoting *Camp v.*

15   *Pitts*, 411 U.S. 138, 142 (1973)).  The Ninth Circuit has, "however, crafted narrow

16   exceptions to this general rule."  *Lands Council v. Powell*, 395 F.3d 1019, 1030 (9th Cir.

17   2005).  The exceptions are as follows:

18   _____

19        [2] NMFS has promulgated regulations under section 4(d) of the ESA, commonly known as

20   the "4(d) Rule," that apply the take prohibition to several threatened salmonid species. 50 C.F.R.
     §§ 223.102(c)(8) and (23), and 223.203(a). The 4(d) Rule includes several exemptions,

21   commonly referred to as the "4(d) Limits." 50 C.F.R. § 223.203(b). One such exemption—Limit
     6—exempts take resulting from the implementation of a joint tribal/state resource management

22   plan that NMFS has determined "will not appreciably reduce the likelihood of survival and
     recovery of affected threatened [species]." 50 C.F.R. § 223.203(b)(6)(i).

1    (1) supplementation is necessary to determine if the agency has considered all factors and explained its decision; (2) the agency relied on documents not in the record; (3) supplementation is needed to explain technical terms or complex subjects; or (4) plaintiffs have shown bad faith on the part of the agency.

*Fence Creek Cattle Co. v. U.S. Forest Serv*., 602 F.3d 1125, 1131 (9th Cir. 2010).

In this case, both parties move to strike material submitted with the cross-motions. Dkts. 164 at 28–29, 170 at 8–9, 171 at 8–9, 175.[3]  Both parties have failed to show that the contested evidence meets one of the limited exceptions set forth above.  Accordingly, the Court will not only grant the motions to strike, but will also limit its review to the agency record.

**B.   Summary Judgment**

Plaintiffs have asserted claims under the National Environmental Policy Act ("NEPA"), the Endangered Species Act ("ESA"), and the Administrative Procedures Act ("APA").  The parties move for summary judgment on Plaintiffs' Second Claim for Relief (NEPA challenge alleging a failure to prepare supplemental EIS on the Elwha River Fish Restoration Plan ("Fish Restoration Plan")); Dkt. 1, ¶¶ 142–147; Fourth Claim for Relief (ESA § 7(a)(2) challenge alleging a failure to consult on the Fish Restoration Plan), *Id*. ¶¶ 153–157; Seventh Claim for Relief (ESA § 7(a)(2) challenge alleging that the Fish Restoration Plan jeopardizes listed species), *Id*. ¶¶ 172–175; Twelfth Claim for Relief (APA challenge to the July 2012 Biological Opinion ("July BiOp")), Dkt. 66, ¶¶ 23–24; Thirteenth Claim for Relief (APA challenge to NMFS' Limit 6 Exemption), Dkt.

---

[3] When citing particular pages of the parties' briefs, the Court provides the electronic docket pagination, which appears at the top of each document.

125, ¶¶ 44–45; Fourteenth Claim for Relief (APA challenge to December 2012

Biological Opinion ("December BiOp")), *Id*. ¶¶ 46–47; Fifteenth Claim for Relief (NEPA

challenge to NMFS' Environmental Assessment ("EA")), *Id*. ¶¶ 48–49; Sixteenth Claim

for Relief (NEPA challenge alleging a failure to prepare an Environmental Impact

Statement ("EIS")), *Id*. ¶¶ 50–51.2 .

### 1.     Standard

Summary judgment is proper only if the pleadings, the discovery and disclosure

materials on file, and any affidavits show that there is no genuine issue as to any material

fact and that the movant is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).

The moving party is entitled to judgment as a matter of law when the nonmoving party

fails to make a sufficient showing on an essential element of a claim in the case on which

the nonmoving party has the burden of proof.  *Celotex Corp. v. Catrett*, 477 U.S. 317,

323 (1986).

In this case, the parties agree that the issues may be decided based on the record

before the Court and are amenable to summary judgment.

### 2.     NEPA

NEPA is a procedural statute, designed to ensure that agencies consider both the

environmental impacts of a proposed action, and reasonable alternatives, before

proceeding with a federal action.  42 U.S.C. §§ 4321, *et seq*.  NEPA aims to foster

informed decisionmaking and public participation by making relevant environmental

information available to both the agency and the interested public.  *Robertson v. Methow

Valley Citizens Council*, 490 U.S. 332, 349 (1989).

1    The NEPA process starts with scoping, a process to determine the scope of the

2    issues to be addressed in an EA or EIS.  40 C.F.R. § 1501.7.  Following scoping, the

3    agency may decide to first prepare an EA, to determine whether the environmental effects

4    of the action will be significant.  40 C.F.R. §§ 1501.4(b); 1508.9.  An EA must include

5    "brief discussions of the need for the proposal, of alternatives . . . , of the environmental

6    impacts of the proposed action and alternatives, and a listing of agencies and persons

7    consulted."  40 C.F.R. § 1508.9(b).  If, on the basis of the EA, an agency finds that a

8    contemplated action does not "significantly affect[] the quality of the human

9    environment," the agency may prepare and issue a Finding of No Significant Impact

10   ("FONSI") outlining why the project will have no significant impact and does not require

11   an EIS.  *Dep't of Transp. v. Pub. Citizen*, 541 U.S. 752, 757–58 (2004); 40 C.F.R. §§

12   1501.4(e), 1508.13.

13        In this case, Plaintiffs assert that the Federal Defendants violated NEPA "by

14   failing to prepare an EIS for their approval and funding of the hatchery programs."  Dkt.

15   153 at 28.  The Federal Defendants counter that the use of hatcheries was included in the

16   Implementation EIS and any challenge to the adequacy of that EIS is time barred.  Dkt.

17   164 at 30; Dkt. 171 at 10–11.  The Court agrees.  The Implementation EIS and the SEIS

18   discussed the use of hatcheries, and the proper time to challenge those documents has

19   passed.  28 U.S.C. § 2401(a) (six-year statute of limitations for APA claims).  Plaintiffs

20   may not overcome this bar by arguing that the documents did not fully consider the

21   impacts of the actual implementation of the hatchery programs, which challenges the

22   adequacy of the Fish Restoration Plan attached to the Implementation EIS.  *See, e.g.*, Dkt.

1    170 at 11 ("The Implementation EIS did not evaluate adverse effects associated with

2    hatcheries, nor did it include an analysis of alternatives to the use of hatcheries.")

3    Therefore, the issue is reduced to whether the Limit 6 EA was properly tiered to the EISs.

4           The Council on Environmental Quality ("CEQ"), an agency created by NEPA

5    within the Office of the President, has promulgated regulations that guide agencies'

6    compliance with the federal statutes. 40 C.F.R. §§ 1500.1-1508.28.  Under these

7    regulations, "tiering" is defined as:

8           [T]he coverage of general matters in broader environmental impact
            statements (such as national program or policy statements) with subsequent
9           narrower statements or environmental analyses (such as regional or
            basinwide program statements or ultimately site-specific statements)
10          incorporating by reference the general discussions and concentrating solely
            on the issues specific to the statement subsequently prepared. Tiering is
11          appropriate when the sequence of statements or analyses is:
            (a) From a program, plan, or policy environmental impact statement
12          to a program, plan, or policy statement or analysis of lesser scope or to a
            site-specific statement or analysis.
13          (b) From an environmental impact statement on a specific action at
            an early stage (such as need and site selection) to a supplement (which is
14          preferred) or a subsequent statement or analysis at a later stage (such as
            environmental mitigation). Tiering in such cases is appropriate when it
15          helps the lead agency to focus on the issues which are ripe for decision and
            exclude from consideration issues already decided or not yet ripe.
16
     *Id*. 1508.28.
17
            In this case, the Federal Defendants assert that the process of early EISs followed
18
     by the Limit 6 EA of specific actions contemplated in the EISs "is exactly the type of
19
     tiering contemplated by CEQ's regulations."  Dkt. 171 at 12.  The Court agrees because
20
     the "impacts of the hatcheries [is] an issue both 'of lesser scope' than the prior EISs, and
21
     'at a later stage' in the planning process."  *Id*.  The EISs easily convey the fact that this
22

1   project is "the largest dam removal project in United States history" (Dkt. 153 at 10)

2   impacting numerous aspects of the environment, including the native runs of salmonids.

3   The proposed actions contemplated the removal activities and sediment flow on the runs

4   and the supplementation of the run with hatchery programs.  Once the HGMPs were

5   developed, they were submitted for approval.  NMFS conducted an EA on the HGMPs

6   and issued a FONSI.  This specific EA was appropriately tiered to the earlier ESIs.

7   Plaintiffs, however, present two arguments that the process was not appropriately tiered.

8       First, Plaintiffs misconstrue a more general CEQ regulation.  Plaintiffs argue that

9   tiering is only appropriate for reducing repetitive discussions.  Dkt. 170 at 12 (citing 40

10  C.F.R. § 1502.20).  While this regulation approves summaries of prior statements and

11  incorporation by reference of broader discussions, the regulation clearly states that

12  agencies are "encouraged to tier environmental impact statements" and then directly cites

13  the regulation that provides guidance as to when tiering is appropriate (40 C.F.R. §

14  1508.20).  DOI followed the more specific regulation and the Court declines to accept

15  Plaintiffs' misplaced reading of the more general statute.

16      Second, Plaintiffs cite three cases for the proposition that an EIS should have been

17  tiered instead of an EA because the prior EISs did not adequately cover the adverse

18  effects of the action.  Dkt. 170 at 12.  The proper argument, however, is that the current

19  EA is defective because neither the current EA nor the parent EISs adequately account

20  for effects of the proposed action on the environment.  *See, e.g., Muckleshoot Indian*

21  *Tribe v. U.S. Forest Serv.*, 177 F.3d 800 (9th Cir. 1999) ("Our review of the [perevious]

22  Plan and its accompanying EIS reveals that those documents do not account for the

1    specific impacts of the [proposed action] and do not remedy the [agency's] failure to

2    account for the impacts of the [proposed action] in the [current] EIS.").  Therefore,

3    Plaintiffs' motion is denied on this issue, and the next step is to evaluate the adequacy of

4    the Limit 6 EA.

5         **3.      The Limit 6 EA**

6         Plaintiffs challenge the adequacy of the Limit 6 EA arguing that it was improperly

7    postponed, it inadequately considers the cumulative impacts on the Puget Sound, it fails

8    to consider appropriate alternatives, and it assumed an inappropriate baseline.

9         **a.      Improperly Postponed**

10        Plaintiffs assert that the "Federal Defendants violated NEPA by postponing

11   processes until after decisions were made and by failing to supplement the

12   Implementation EIS."  Dkt. 170 at 19.  With regard to the former assertion, the Federal

13   Defendants argue that Plaintiffs lack standing to bring this claim.  The Court tends to

14   agree with the Federal Defendants because any redress would result in an even longer

15   postponed EA.  Regardless, an agency must complete an EA before making "an

16   irreversible and irretrievable commitment of resources."  *Metcalf v. Daley*, 214 F.3d

17   1135, 1142 (9th Cir. 2000).  The record is devoid of any evidence of such an irreversible

18   or irretrievable commitment.  Funding of hatcheries can always be stopped and the

19   stipulated preliminary injunction has precluded the introduction of hatchery fish.

20   Therefore, the Court denies Plaintiffs' motion on this issue.

21        With regard to the failure to supplement the Implementation EIS, Plaintiffs'

22   argument is based on their own assessment that the HGMPs will harm the environment.

1    Agencies are required to supplement an existing EIS only where there are "substantial

2    changes to the proposed action" or "significant new circumstances or information"

3    relevant to environmental concerns.  40 C.F.R. 1502.9(c)(1).  To trigger a supplemental

4    EIS, the changes or new information must present "a seriously different picture of the

5    likely environmental harms stemming from the proposed action."  *Airport Communities*

6    *Coal. v. Graves*, 280 F. Supp. 2d 1207, 1218 (W.D. Wash. 2003) (quoting *Wisc. v.*

7    *Weinberger*, 745 F.2d 412, 420 (7th Cir. 1984)).  Moreover, an agency's decision not to

8    prepare a supplemental EIS will not be overturned absent a "clear error of judgment."

9    *Marsh v. Oregon Natural Res. Council*, 490 U.S. 360, 377-78, 385 (1989).

10          In this case, the approval of the HGMPs did not require a supplemental EIS

11    because both NMFS and NPS have issued FONSIs on the proposed implementations.

12    These FONSIs completely undermine any argument that implementation of the HGMPs

13    presents a seriously different picture of the likely environmental harms of hatchery fish

14    on the wild runs.  Moreover, nothing in the record shows a clear error of judgment by

15    either agency.  Therefore, the Court denies Plaintiffs' motion on this issue and grants the

16    Federal Defendants' motion on this issue.

17                       **b.    Cumulative Impacts**

18          "NEPA requires an agency to consider" cumulative impacts, which "result[ ] from

19    the incremental impact of the action when added to other past, present and reasonably

20    foreseeable actions regardless of what agency . . . or person undertakes such other

21    actions."  *NRDC v. U.S. Forest Serv.*, 421 F.3d 797, 814 (9th Cir. 2005) (internal

22    quotation marks omitted); *see also* 40 C.F.R. § 1508.7 (defining cumulative impacts in

1   this way).  "Consideration of cumulative impacts requires some quantified or detailed

2   information" that results in a "useful analysis," even when the agency is preparing an EA

3   and not an EIS.  *See Kern v. Bureau of Land Mgmt.*, 284 F.3d 1062, 1075 (9th Cir. 2002)

4   (internal quotation marks omitted).  "[G]eneral statements about possible effects and

5   some risk do not constitute a hard look absent a justification regarding why more

6   definitive information could not be provided."  *Id.* (internal quotation marks omitted).

7          In this case, Plaintiffs argue that the EA does not adequately consider the

8   cumulative impact of other Puget Sound hatchery programs on the Elwha River wild fish.

9   Dkt. 153 at 43–44.  In the introduction paragraph to the cumulative impacts section, the

10  EA provides a reference to other "hatchery production."  NMFS015487.  Specifically, the

11  EA states that "Chapter 3 . . . describes baseline conditions, which reflect the effects of

12  past and existing actions (including . . . hatchery production)."  *Id.*  The Federal

13  Defendants argue that the hatcheries were appropriately included in the baseline

14  conditions.  The Court agrees because there can be no more quantified or detailed

15  information regarding the incremental impact of the proposed action than the actual

16  numbers of returning fish based on previous releases.  With regard to future projects, the

17  EA accounts for such projects in the monitoring requirements of the hatchery programs

18  that protect the wild runs and mitigate for adverse impacts on the wild runs.

19  NMFS015487-015488.  Therefore, the Court denies Plaintiffs' motion on this issue and

20  grants Defendants' motion on this issue.

21

22

1          c.     **Appropriate Alternatives**

2          An EA must contain a "brief discussion of reasonable alternatives." *Ctr. for Biol.*

3   *Div. v. Salazar*, 695 F.3d 893, 915 (9th Cir. 2012); *see* 40 C.F.R. § 1508.9(b).  The

4   reasonableness of an alternative is determined by the "purpose and need" of the project.

5   *League of Wilderness Defs.-Blue Mtns. Biodiv. Project v. U.S. Forest Serv.*, 689 F.3d

6   1060, 1069 (9th Cir. 2012).  Alternatives which do not achieve the purpose and need,

7   which are not "significantly distinguishable from alternatives already considered, or

8   which have substantially similar consequences" need not be considered.  *Native*

9   *Ecosystems Council v. U.S. Forest Serv.*, 428 F.3d 1233, 1246-47 (9th Cir. 2005);

10  *Headwaters, Inc. v. BLM*, 914 F.2d 1174, 1180 (9th Cir. 1990). Although an agency must

11  still "give full and meaningful consideration to all reasonable alternatives" in an

12  environmental assessment, the agency's obligation to discuss alternatives is less than in

13  an EIS.  *N. Idaho Cmty. Action Network v. U.S. Dep't of Transp.*, 545 F.3d 1147, 1153

14  (9th Cir. 2008) (per curiam).  "The existence of a viable but unexamined alternative

15  renders an [EA] inadequate."  *Westlands Water Dist. v. U.S. Dep't of Interior*, 376 F.3d

16  853, 868 (9th Cir. 2004) (quoting *Morongo Band of Mission Indians v. Fed. Aviation*

17  *Admin.*, 161 F.3d 569, 575 (9th Cir. 1998)).

18         In this case, Plaintiffs argue that the "Limit 6 EA violates NEPA by failing to

19  consider an alternative with smaller hatchery production."  Dkt. 153 at 44.  In their

20  supplemental brief, the Federal Defendants argue first that NMFS's range of alternatives

21  was reasonable.  Dkt. 188 at 7–8.  Plaintiffs, however, do not appear to contest the range

22  of alternatives.  Plaintiffs argue that NMFS failed to give meaningful consideration to the

1    alternative of reduced releases of hatchery fish.  Dkt. 153 at 44–46.  Therefore, the Court

2    finds that the Federal Defendants' concern as to the range of alternatives is moot.

3          With regard to the NMFS's selection of alternatives, the Federal Defendants

4    provide four arguments why NMFS met its burden.  Those arguments are that (1)

5    substantially reduced production levels would not ensure Elwha River restoration in a 20-

6    to 30-year time frame, (2) decreased production levels would not satisfy the purpose and

7    need for fulfillment of treaty-reserved fishing rights, (3) the proposed HGMPs contain

8    already-reduced hatchery production levels, and (4) NMFS considered two other

9    alternatives that provided decreased hatchery releases.  Dkt. 188 at 9–18.

10                     **i.      Restoration**

11         The Federal Defendants argue that the proposed action "would likely produce the

12   minimally acceptable number of adult returns," and, without the release of the proposed

13   numbers, "the remnant Elwha River populations would face the risk of extripation . . . ."

14   Dkt. 188 at 9–10.  To support this argument, the Federal Defendants refer to the

15   December BiOp.  *See id.*  With regard to Chinook salmon and based on the proposed

16   release, the BiOp estimates a return of 1,685 adult fish.  NMFS016055.  The BiOp states

17   that 1,700 adult fish "would be required each year just to stock to sustain the hatchery

18   program . . . ."  *Id.*  While the Federal Defendants are correct that such numbers render

19   the alternative of lesser releases unreasonable, it also renders unreasonable the operation

20   of an unsustainable hatchery program if restoration is the goal of the program.  In other

21   words, it is unclear how restoration in 20 to 30 years will be accomplished if the current

22   releases are sufficient to only maintain the status quo.

1    Contrary to the Chinook release in the mere sustainability range, the steelhead

2    release would result in an overwhelming population of hatchery fish compared to

3    naturally spawning fish.  The EA states that average escapement for recent runs is 141

4    fish, all of natural origin.  NMFS015418.  The steelhead HGMP proposes a release of

5    175,000 fish with a survival rate of 0.75%, which means an estimated return of 1,312

6    hatchery fish.  NMFS009031.  The release, therefore, would result in approximately 90%

7    of the returning steelhead population as hatchery fish.  The Court finds NMFS's

8    conclusion that there is not a meaningful difference, or viable alternative, between 0%

9    and 90% is suspect.  *See, e.g., Native Fish Soc'y v. Nat'l Marine Fisheries Serv.*, 2014

10   WL 199093 at * (D. Or. Jan. 16, 2014) ("Given the obvious difference between the

11   release of approximately 1,000,000 smolts and zero smolts, it is not clear why it would

12   not be meaningful to analyze a number somewhere in the middle . . .").  Moreover, the

13   proposed actions seem extremely arbitrary if the returning Chinook population is barely

14   enough to sustain the hatchery program whereas the returning steelhead population will

15   result in the overwhelming majority of 90% of the returning and spawning population.

16   There is no explanation, let alone a "brief discussion," of this discrepancy.

17        With regard to the coho runs, the Federal Defendants argue that the proposed

18   release numbers meet the dual goal of meeting the broodstock collection goals and

19   allowing excess spawners to return to the river.  Dkt. 188 at 11.  Specifically, based on a

20   release of 425,000 fish, one can expect approximately 2,921 adult fish to return, from

21   which 400-600 would be collected for broodstock.  This estimate leaves 2,400 fish per

22   year to help restore the Elwha stock, or roughly 82% of the release will repopulate the

1   river.  Again, the Court finds that there is a meaningful difference, or viable alternative,

2   between 0% and 82%, and the record fails to contain even a brief discussion of why a

3   reduced release would result in substantially similar consequences as no release at all.

4   This finding is in accord with recent Ninth Circuit case law wherein the court was

5   "troubled" by the agency's "decision not to consider a reduced- or no-grazing alternative

6   at the site-specific level, having chosen not to perform that review at the programmatic

7   level." *Western Watersheds Project v. Abbey*, 719 F.3d 1035, 1050–1051 (9th Cir. 2013)

8   (concluding that EA was inadequate for failing to considered reduced alternative).

9                    **ii.        Fishing Rights**

10          The Federal Defendants argue that decreasing the proposed releases would not

11   meet the purpose and need of meeting the Tribal treaty fishing rights.  Dkt. 188 at 14–15.

12   This argument is spurious.  First, there is a fishing moratorium through 2018.

13   NMFS015479.  Second, even with the proposed action, the Tribe has agreed to base its

14   catch on the number of returning fish.  *Id.* (after 2018, Tribe would limit its catch to 50

15   fish if return exceeds 300 fish).  Finally, the detailed analysis of the "reasonable"

16   alternatives only evaluated fishing for steelhead and did not evaluate fishing for any other

17   species.  Therefore, this does not appear to be an issue with the proposed releases, let

18   alone a viable reduced release.

19                    **iii.        Includes Reduced Release Alternative**

20          The Federal Defendants argue that the proposed alternative already includes

21   reduced releases from those originally proposed by the State and Tribe.  Dkt. 188 at 16.

22   There is absolutely no authority for the proposition that an agency may meet its burden of

1   analyzing all viable alternatives by settling on half the initially proposed number instead

2   of taking a "hard look" at the proposed action.  Moreover, the reduction from the initial

3   numbers was based on the capacity of the current hatcheries (NMFS15402–015403) and,

4   apparently, involved no consideration of the impact of the proposed release on the wild

5   runs.  The reduction also lends support to the notion that the current proposed numbers

6   reflect the maximum capacity of the hatcheries and may not be based on consideration of

7   the impacts on the endangered species or the wild runs.  Regardless, the Court declines to

8   accept the Federal Defendants' proposition on this issue.

9   **iv.      Two Other Alternatives**

10      The Federal Defendants argue that "NMFS considered two other unique

11  alternatives that provided for fewer releases of hatchery-origin fish."  Dkt. 188 at 16.

12  First, the Federal Defendants cite to the alternative with the sunset term.  *Id*.  While such

13  an alternative considers a reduction of future releases, it fails to consider present releases

14  and is inadequate to overcome the deficiencies set forth above.

15      Second, the Federal Defendants cite the alternative of operating only the Chinook

16  and steelhead hatcheries.  Dkt. 188 at 18.  Not only was this alternative merely

17  considered instead of being analyzed, it also fails to address the problems set forth above

18  with these two hatchery programs.

19      Therefore, the Court grants Plaintiffs' motion as to the inadequacy of the

20  December 2012 EA.

21

22

1                          **d.    Inappropriate Baseline**

2              Plaintiffs argue that the EA inappropriately assumed that the baseline included the

3    previous Elwha hatchery operations.  The Ninth Circuit law, however, is clear that the

4    Court should "defer to the Commission's decision to use an existing project

5    environmental baseline."  *American Rivers v. F.E.R.C.*, 201 F.3d 1186 (9th Cir. 1999).

6    The Court finds that there is nothing unreasonable in adopting a baseline condition

7    including the hatcheries that have been operating for years before the EA was initiated.

8    Therefore, the Court denies Plaintiffs' motion on this issue.

9    **C.    ESA**

10             The ESA contains both substantive and procedural requirements designed to carry

11   out the goal of conserving endangered and threatened species and the ecosystems on

12   which they depend.  16 U.S.C. § 1531(b).  Plaintiffs assert numerous arguments that the

13   Federal Defendants failed to comply with the ESA.  Dkt. 153 at 48–58.  First, Plaintiffs

14   argue that the Federal Defendants improperly segmented consultation between the July

15   BiOp and the December BiOp.  Dkt. 153 at 48–50.  The July BiOp addressed dam

16   removal, broodstock collection of endangered Chinook and steelhead, and out-planting of

17   these stocks.  NMFS008929–008930.  The December BiOp addressed the broader

18   ongoing hatchery operations.  NMFS015911–0015915.  These are not interrelated

19   projects because one could, and did in fact, occur without the other; the dams have been

20   removed and the hatchery releases have been on hold.  Therefore, the Court denies

21   Plaintiffs' motion on this issue.

22

1    Second, Plaintiffs argue that the Federal Defendants failed to evaluate the full

2   extent of the harm from broodstock collection and failed to adequately define the full

3   extent of take from broodstock activities.  Dkt. 153 at 50–52.  Contrary to Plaintiffs'

4   contentions, the take explained in the July BiOp was incorporated in the December

5   BiOp's baseline and the December BiOp adequately defined the number of take of

6   endangered species.  NMFS016067, NMFS016085.  Therefore, the Court denies

7   Plaintiffs' motion on this issue.

8    Third, Plaintiffs argue that the July BiOp impermissibly relies on undefined

9   mitigation.  Dkt. 170 at 26–27.  Contrary to Plaintiffs' contention, the July BiOp was

10  amended to include such measures.  NMFS13197–13200.  The Court finds that these

11  measures are reasonably specific, certain to occur, and capable of implementation.  *See*

12  *Sierra Club v. Marsh*, 816 F.2d 1376 (9th Cir. 1987).   Therefore, the Court denies

13  Plaintiffs' motion on this issue.

14   Fourth, Plaintiffs argue that the December BiOp defined an improperly narrow

15  action area.  NMFS, however, is accorded deference in defining the action area because it

16  involves "application of scientific methodology . . . ."  *Native Ecosystems Council v.*

17  *Dombeck*, 304 F.3d 886, 902 (9th Cir. 2002).  Even without such deference, the

18  December BiOp provides adequate reasons for the scope of the action area.

19  NMFS015944–015946.  Therefore, the Court denies Plaintiffs' motion on this issue.

20   Fifth, Plaintiffs argue that the December BiOp is inadequate because it fails to

21  define the full extent of take.  Plaintiffs, however, fail to show that the Federal

22  Defendants must account for every possible form of take.  The Federal Defendants

1    contend that every court to address this "argument has rejected Plaintiffs' novel

2    interpretation."  Dkt. 164 at 56; *see, e.g., Nw. Envtl. Def. Ctr. v. U.S. Army Corps of*

3    *Eng'rs*, 817 F. Supp. 2d 1290, 1305 (D. Or. 2011) ("nothing in the ESA, its implementing

4    regulations, or the case law requires NMFS to develop a surrogate that must address *all*

5    of the stressors that may cause take.") Regardless, the Court finds that it was not arbitrary

6    and capricious for NMFS not to separately account for genetic and ecological effects on

7    the endangered species.  Therefore, the Court denies Plaintiffs' motion on this issue.

8           Finally, under the ESA, Plaintiffs claim that the DOI failed to consult before

9    funding the hatcheries.  Dkt. 153 at 55–58.  The Court finds that this claim is moot for

10   several reasons.  For example, the Court has already addressed Plaintiffs' failure to notify

11   the proper agencies.  *See* Dkt. 112.  Even if Plaintiffs had notified the proper agencies,

12   the December BiOp properly identifies the "action agencies" and elects NMFS the lead

13   agency for the purpose of the consultation.  Therefore, the Court denies Plaintiffs' motion

14   on the DOI's failure to consult because the claim is moot.

15   **D.    Remedies**

16          Under the APA, an agency action held to be unlawful is ordinarily set aside and

17   remanded to the agency.  5 U.S.C. § 706(2); *Fla. Power & Light Co. v. Lorion*, 470 U.S.

18   729, 744 (1985) ("the proper course, except in rare circumstances, is to remand to the

19   agency for additional investigation or explanation").  However, a court "is not required to

20   set aside every unlawful agency action." *National Wildlife Federation v. Espy*, 45 F.3d

21   1337, 1343 (9th Cir. 1995).  Whether a court should grant injunctive relief under the APA

22   is "controlled by principles of equity." *Id.* (citing *Westlands Water Dist. v. Firebaugh*

*Canal*, 10 F.3d 667, 673 (9th Cir. 1993); *Sierra Pacific Industries v. Lyng*, 866 F.2d 1099, 1111 (9th Cir. 1989)).  "When equity demands, [a flawed action] can be left in place while the agency follows the necessary procedures to correct its action." *Cal. Cmtys. Against Toxics v. EPA*, 688 F.3d 989, 992 (9th Cir. 2012) (quoting *Idaho Farm Bureau Fed'n v. Babbitt*, 58 F.3d 1392, 1405 (9th Cir. 1995) (internal quotation marks ommitted)).  "Whether agency action should be vacated depends on how serious the agency's errors are 'and the disruptive consequences of an interim change that may itself be changed.'" *Id.* (quoting *Allied–Signal Inc. v. U.S. Nuclear Regulatory Comm'n*, 988 F.2d 146, 150–51 (D.C. Cir. 1993)).

In this case, the parties informed the Court that they have stipulated to brief the issue of remedies after the Court issues an order on the instant cross-motions.  First, the Court is concerned with the spring coho and steelhead releases.  In light of the deficiency in the EA, the Court directs the parties to immediately meet and confer regarding Plaintiffs' proposed release of 50,000 steelhead smolt and 50,000 coho smolt.  *See* Dkt. 180 at 24.  The portion of the EA regarding releasing no hatchery fish, alternative 4, has been analyzed and found to be an inadequate alternative to meet the purpose and scope of the project.  Pending further evaluation of the reduced release alternative, it would seem that Plaintiffs' proposed release would be a good starting point for an agreement.

Second, the Court is also concerned about the fall releases. The parties shall also meet and confer regarding these releases.  Pending failure to agree, the parties may file a proposed briefing schedule on these releases as well as additional remedies.

1

## IV. ORDER

2        Therefore, it is hereby **ORDERED** that Plaintiffs' motion for summary judgment

3  (Dkt. 153) is **GRANTED in part** and **DENIED in part**, the Federal Defendants' cross

4  motion for summary judgment (Dkt. 164) is **GRANTED in part** and **DENIED in part**,

5  and the parties shall meet and confer regarding remedies as set forth herein.

6        Dated this 26th day of March, 2014.

7

8        _____

9        BENJAMIN H. SETTLE
         United States District Judge

10

11

12

13

14

15

16

17

18

19

20

21

22